Ida L. Casper, Administratrix, Appellee, v. Illinois Central Railroad Company, Appellant.

1. RES JUDICATA—*effect of opinion of Appellate Court.* The opinion of the Appellate Court rendered upon one hearing of a cause is binding upon a subsequent hearing and likewise upon the trial court.

2. APPELLATE COURTS—*section 87 of Practice Act construed.* The question presented to the trial court upon a motion to direct a verdict is one of law and not of fact; in deciding that question the trial court is not empowered to weigh the evidence and thereby assume to find any fact, but its function is limited to determining whether or not there is any competent evidence in the record fairly tending to prove the fact in issue. The power vested in the Appellate Court by virtue of section 87 of the Practice Act is, however, much broader, and includes the power upon appeal from a judgment of the trial court, to reverse such judgment without remanding the cause upon the ground that the weight of the evidence does not authorize the verdict. Alfred v. C. C. C. & St. L. Ry. Co., 123 Ill. App. 477, followed.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Ford county; the Hon. T. M. HARRIS, Judge, presiding. Heard in this court at the May term, 1910. Reversed with finding of fact. Opinion filed May 26, 1911. *Certiorari* denied by Supreme Court (making opinion final).

CLOUD & THOMPSON, for appellant; JOHN G. DRENNAN, of counsel.

RAY & DOBBINS and SCHNEIDER & SCHNEIDER, for appellee.

MR. JUSTICE BAUME delivered the opinion of the court.

Upon a former appeal from a judgment in favor of appellee and against appellant for $2500 for wrongfully causing the death of appellee's intestate, such judgment was re-

versed and the cause remanded because of the admission of incompetent evidence and the giving of improper instructions. 149 Ill. App. 588. A subsequent trial of the case resulted in a verdict and judgment against appellant for $5000 to reverse which judgment this further appeal is prosecuted.

The main facts in the case are disclosed in the former opinion in which it was held that the trial court properly refused to give the peremptory instruction tendered by appellant because we were unable to say as a matter of law that the deceased was guilty of contributory negligence. The evidence adduced upon the last trial was the same in every substantial particular as that adduced upon the former trial, and the conclusion arrived at by this court upon the former appeal that such peremptory instruction was properly refused was binding upon the trial court on the subsequent trial of the case when similar instructions were tendered by appellant at the close of the evidence for appellee and at the close of all the evidence, and such conclusion is binding upon this court on the present appeal.

In C. C. C. & St. L. Ry. Co. v. Alfred, 123 Ill. App. 477, we held that the question presented to the trial court upon a motion to direct a verdict was one of law and not of fact; that in deciding that question the trial court was not empowered to weigh the evidence and thereby assume to find any fact, but its function was limited to determining whether or not there was any competent evidence in the record fairly tending to prove the fact in issue; that the power vested in the Appellate Court by virtue of sction 87 of the Practice Act was much broader than the power vested in the trial court, and included the power, upon appeal from the judgment of the trial court, to reverse such judgment without remanding the cause upon the ground that the weight of the evidence does not authorize the verdict. The rule as thus stated is supported by abundant authority citcd in the Alfred case.

Conceding in the case at bar, that appellee established the negligence of appellant as charged in the declaration it

106 APPELLATE COURTS OF ILLINOIS.

Casper v. Illinois Cent. R. Co., 162 Ill. App. 104.

was still incumbent upon her to show that her intestate, at the time he received the injury which caused his death, was not guilty of negligence which contributed to produce such injury, or in other words that he was then in the exercise of due care and caution for his own safety.

The only witnesses who saw the deceased, or the wagon in which he was riding, at and immediately prior to the time he was killed, were A. H. Isbell, the engineer upon appellant's locomotive, and E. S. Scudder, a bystander. Isbell testified substantially, as follows: "As I approached Randolph street I saw a person approaching the crossing. When I first observed this person approaching the tracks I think I was about thirty feet from the center of the street. As I approached and got within about thirty feet of Randolph street crossing I saw a mule team coming up Randolph street from the south, in a very fast trot, and they came on. I got to the center of the crossing before the mules did, but they veered off towards the east side of the crossing and jumped across the front of the engine and the engine struck the front wheel of the wagon. When I first saw the team it was moving as fast as it could trot, it was going north. I thought it was in the middle of the street. It was hitched to a delivery wagon. I saw a person in the wagon. He was sitting in the east side of the front end of the wagon. He was doing nothing so far as I saw. When I saw him he was just sitting there in the wagon and the lines tied up and hanging from the top of the wagon, he did not have hold of them. I did not see him make any motion while he was within my view. I watched the wagon until it was struck. I watched it what time it lasted. I saw them until they crossed in front of me. I was looking at them all the time until they crossed the track. The way the mules were coming and I was going if they had come on in the middle of the track, they would have run into the engine."

Scudder testified substantially as follows: "Before the train got to Randolph street I was less than ten feet from the track, perhaps six feet. I observed a team coming in

the direction of the tracks, from the south, on Randolph street, when the train got up almost on to the crossing. While I was standing there waiting for the train to pass, and the train got close to the crossing, I heard a team coming at a rapid rate of speed, the wagon making considerable racket on the pavement. This team came up at a fast trot, and when the engine came onto the crossing, perhaps the pilot in the center of the brick pavement, the team discovered the engine and sheered off to the east and went around to the sidewalk, and they started in a run as soon as they saw the engine, to get by. The team got over and the wagon just struck the pilot, and the team broke loose and went on, and the wagon turned over to the south. When I saw the team coming, I saw there was going to be an accident, and I ran out and hallooed at them, and took off my cap and yelled at them. I was too late, it did no good. I hallooed, "Whoa" as loud as I could halloo. I think three times, two or three times. When I first saw the team it was perhaps forty or fifty feet from the track. The team was going I think better than ten miles an hour. I think they were trotting, I will not be positive about that, but when they discovered the engine on the crossing, they started in a run and swung around, and went over off of the walk—one of the team, it was the east mule. The team was going faster than the train. I did not see anyone in the wagon. There was a cover over the wagon, I think it projected out to the dash-board anyway. I don't think the whole thing occupied more than two seconds, it was very quickly done."

It is uncontroverted that the evening upon which the deceased was killed was dark and the weather was cold and misty; that he was riding on the seat of the delivery wagon, and that the wagon cover was down so that both sides of the seat were enclosed by the cover, and a hood projected out above the seat; that deceased was familiar with the crossing, having occasion to drive over it frequently every weekday; that he knew no gates were maintained or operated at the crossing. While it may not be said that the failure of the deceased as he approached the crossing to stop and look

and listen constituted contributory negligence on his part as a matter of law, we are irresistibly forced to the conclusion that the conduct of the deceased in driving his team at a rapid pace toward and upon the railroad crossing, under the circumstances disclosed by the evidence, was such contributory negligence on his part as a matter of fact, as precludes a recovery in this case.

The judgment of the circuit court is reversed with a finding of fact to be incorporated in the judgment of this court.

*Reversed with finding of fact.*

Finding of fact: We find as an ultimate fact that at and immediately prior to his death, appellee's intestate was not in the exercise of ordinary care for his own safety.

MR. JUSTICE PHILBRICK took no part.